Next case call for oral argument is Jackson v. Board of Trustees of the Police Pension Fund. Before coming to this meeting to inform he would not be here for fair or included in his present statement of essa and   my first death requesting reversal for his decision ruling that he was entitled to a non-duty rather line of duty disability pension. I submit the application, the manifest weight standard merits reversal for several reasons. Board decision was based on, first of all, lack of documented complaints of hip pain at the scene and the fire began at 7 o'clock and his admission to the emergency room at 735 approximately a half hour. Decision was also based upon the first documented complaint of hip pain. Basically an hour and a half after his admission to the hospital for smoke inhalation. Even though I will point out hospital records clearly reflect a discharge. So there is a complaint of hip pain and also discharge no smoke inhalation and hip strain. Thirdly, their decision is based upon his actions at the scene did not cause his avascular necrosis. I would submit that the board's decision. His actions at the scene caused him to get on a gurney? Pardon? His actions at the scene caused him to get on a gurney though, didn't it? Yes, it did. Okay. It is, say what if it happened as he got off the gurney? And it wasn't caused by the act of duty, specifically going, crawling on your belly to get somebody out of a fire? Well, I mean, and this gets into my heart. Wouldn't that also be a disability? I mean, it's related too. Yes, I do believe that, Judge. For several reasons. It's part of a complication arising out of his original treatment. He's there because he was attempting to rescue people. I do believe it's all related. This is why we get to the issues of causation, which is what I submit that the board in this decision overlooked. First of all, aggravation of a pre-existing condition is the basis for a line of duty entry. Two, the accident or incident only has to be a cause. It doesn't have to be the first, last, primary. And third, based on the case law, the immediate onset of complaints are not fatal to the claim. To make this decision, the board had to look at the accident, the injury, and most importantly, causal relationship, which I apologize is getting to your issue. Causal relationship is very critical here. The board ignored all relevant evidence with respect to causal relationship. Dr. Wilkie, in his report, established that he believed the accident did aggravate, and we never did submit that the accident caused the avascular necrosis. It's a degenerative condition, it develops over time. But he said that the accident did aggravate the condition. If you look, and it's part of the record, Dr. Jarvis and Dr. Strickland's reports, they do not address the issue of aggravation of a pre-existing condition. They just say the accident didn't cause it. That's why Klayman, at his own expense, deposed these doctors to clarify that issue. And Dr. Jarvis, if you look at his transcript, agreed that the accident aggravated the pre-existing condition and precipitated the need for surgery. Also, Dr. Strickland was much more reluctant, but indicated that the accident was a precipitating event. Counsel has referred to these portions of the transcript as snippets, but these are the critical questions in the case that weren't asked. Also, I think it's important to point out here, this is not an adversarial proceeding like a workman's compensation or civil case, where that's my treating doctor, and well, they didn't have all the correct information and that affected their opinion. Counsel selected the doctors and provided them the basis on which they were required to render their decisions. The doctors had the quote unquote records from Dr. Krause and Dr. Hefner, which talked about the pain getting off the gurney. And so what I'm submitting is, is that I don't believe at this point they can attack my client's credibility, the doctors had all this information and still render an affirmative opinion that this accident did play a role in precipitating or aggravating that condition. And I'm saying that the board just can't simply dismiss this testimony. There has to be a three-step analysis, accident, injury, and causation. They totally excluded, like lay people do from time to time, the medical testimony, but that's the whole purpose of this proceeding. There's no benefit, and they don't even rely on treating doctors. And if you look at the treating doctors, the treating doctors never did offer opinions on causation. There's no mention in there. But this is why I submit that the decision is fatal because of this disregard of key critical evidence. Are there any questions? Let me ask you this. Okay, you acknowledge that he has a pre-existing hypnecrosis. Okay. Would the fact that it was exacerbated by whatever he did to rescue and then getting off the gurney allow him to receive the disability? Yes, and that's consistent with Justice Farmer's decision, all right. So it doesn't have to be the cause of the hypnecrosis, doesn't have to be the crawling. It can be exacerbated and be a recoverable. And in terms of the vein case and the cases I cited in my brief, they're specifically much like civil cases and workman's compensation cases. Now did Dr., was it Wilkie? Yes. Did he, was he deposed? No, he wasn't because he addressed the issue of an aggravation of a pre-existing condition. It's outlined in my brief exactly what he said in that regard. So I made the decision not to depose him because he testified basically, or his report, in my opinion, was favorable to my client. And that's why I made the decision not to depose him. I only depose the physicians who actually, if you look at their reports, as part of the record, don't even address the issue. You don't dispute that it has to be more than just being on duty. He was on duty. I agree. It has to be more than that. I agree. But if you remember, he was fired, crawling on his hands and knees, pulling an oxygen bottle out, and pulling the patients out. And the doctors received that history, along with all the medical records and everything else counsel sent them. And that's my point. I realize there's a dispute here regarding when he claimed the hip pain started. And that's why I said reported. Their argument is, you know, it's only when it's reported that he experienced hip pain. That's different than his testimony at the hearing. There are disputes in that regard. But that's what the expert opinions are for. That's what the medical opinions are for, to judge and evaluate that. And you look across the board, to the contrary, each one of these doctors acknowledged that his activities at the scene were a cause for an aggravating or precipitating factor of that condition. Is your low back hurting consistent with hip necrosis? Pardon? Is your low back hurting? You said, my low back's hurting. Is that consistent with a hip necrosis? It could be. I mean... Was there evidence of that? Pardon? Was there evidence of that? Of what? Low back pain is consistent with hip necrosis. That was never... Because he did complain at the scene of low back pain. That's true. But he didn't complain of hip pain. That's true. Any other questions? You're basically saying that the defense... That your opponent's focused on a sole cause issue and you're saying that that's... You're saying that the aggravation is sufficient. Yes. Okay. Thank you. Thank you, counsel. Counsel? Is this... Yeah. Justice Fulgenhersh, Justice Bomer, Justice Wexton, may it please the court. My name is Dennis Orsi and I'm here today representing the Collinsville Police Pension Fund and the trustees thereof. I'm also accompanied by intervener, Mr. Querry, who's here on behalf of the city of Collinsville. We have elected to divide our time today, 10 minutes apiece. Let me... Let me get right to the heart of matters. As the court is well aware, the plaintiff in this case was awarded a non-duty disability benefit from the pension fund. He sought a line-of-duty disability benefit. Can you speak up a little bit, counsel? Yes. The plaintiff sought a line-of-duty disability benefit. Ultimately, the board awarded him a non-duty disability benefit, believing that he failed to meet the burden of proof required for the line-of-duty disability benefit. The key here is everybody agrees that he suffered from an avascular necrosis that resulted in him requiring that he obtain a left and a right hip replacement, which ultimately disabled him from performing his duties as a police officer. No dispute about that. The dispute comes with how did this happen and did he... Was he engaged in an act of duty when it did happen? The plaintiff would like you to focus on the house fire. We know that is the incident that while on duty, he was called to the scene, engaged in an activity where he was in the house about three minutes, crawled out, immediately complained that he suffered from smoke inhalation. When the EMTs arrived on the scene, that was his primary complaint. He stated that he had thrown up and was having difficulty breathing. He was taken... He also said he had low back pain. Yes, sir. He did state that he had low back pain. Which would be consistent with hip necrosis being exacerbated, perhaps. Justice Westing, you asked the question whether or not there is a connection. There's nothing in... None of the medical doctors commented on that. There's nothing in the record that would show there to be some linkage other than they're both in the lower extremities of the body. But hip pain, in our view, is something different than low back pain. Ultimately, he crawled out of his house and found himself in a position where he was taken by ambulance. While in the ambulance, the EMTs did an inquiry. They made observations. They hooked him up to an IV. They put him on oxygen. He was in the ambulance about ten minutes. Nowhere in that EMT report does it make any reference of any low back pain or hip pain. That's in the record. When he arrives in the emergency room, they do another evaluation. He's in the emergency room about 90 minutes. They do a series of evaluations. The nurse's notes are in the record. No reference to back pain. No reference to hip pain. Until 90 minutes after we're at the hospital, while he is set for an x-ray on a hospital gurney. When he's given off the gurney, he then says he experiences a popping sound and then experiences for the first time the right hip pain, for which it's noted in the nurse's record and she prescribes ibuprofen for him at that instance. Mr. Bashley points out on discharge, there's a notation about the right hip pain, but again, it's critical to note when that was first noted in the hospital records. It was some 90 minutes after he was there. The next time we see references by the plaintiff regarding this right hip pain and when it first occurred is when we take a look at his two treating physicians, which he sought out. He sought out Dr. Hefner approximately 60 days after this incident occurred. And in Dr. Hefner's oral history that he obtained from the patient, the question was, how did it all happen? And Dr. Hefner's notes say he was taken to the hospital for smoke inhalation and after he got up at the hospital, he noticed a pronounced pain in his right lower extremity, right hip and groin area. Then 30 days after that, he sees his second physician, which is Dr. Trous. That's some 90 days after the incident occurred. And Dr. Trous takes an oral history from the plaintiff and he notes in his records, quote, while he was at the hospital, he was getting out of the gurney to get x-rayed and felt a pop in his hip and had severe pain. Now, there's case law that says when we have statements in medical records that are given by the patient to his own examining physicians some 60 and 90 days later, they are credible. They are credible statements. These are, in the applicant's own words, to his own physicians, how things happened. While he talks about being a house fighter, he relates specifically the hip pain came when he was getting off the hospital gurney. I want to address a couple of issues that the applicant brought up regarding Dr. Strickland's statements and Dr. George's statements. First of all, their evidentiary delusions were taken. Both of them said they stood by the statements they made in their initial reports and they're all part of the record. Mr. Badger referred to us referencing snippets that were taken as part of his brief. We would like to remind the court that Dr. Strickland specifically said the alleged injury to the patient's right hip in July of 2007 is not the cause of the need for a hip replacement. And Dr. George stated in his deposition the need for hip replacement is directly attributed to intrinsic disease condition of avascular necrosis, which is not caused by a single traumatic event. Everybody agrees he had a pre-existing condition that ultimately led to the hip replacement surgery, that ultimately led to his disability. The key that we're asking the court to focus on is act of duty and whether or not this act of getting off the hospital gurney when the hip pain developed is the definition. I'm glad you're there. It's unfortunate that we can find medical experts that will tell us everything we want to hear from which other side, either side. But there's no doubt that getting off a gurney is not an act of duty, in my mind. But the reason that he was there because it was an act of duty that put him there. Is that not relevant in the determination if this is a line of duty? Here's why it's not relevant. If we go back and when the questions were asked of Dr. George and Dr. Strickland in their depositions about this concept of how and when this could have happened, you know, both of them indicated he could have been walking across the street. He could have been getting out of his bed. It could have happened at any time. When it did happen was when he was getting off the hospital gurney. But he was there because he just had rescued people from a fire. That's part of the act of duty. Understood, but then would the court logically extend that he went home that night and he got out of the bed and he developed the pain? I mean, I've had an experience, and I'm sure the court's heard of this, where you actually get out of bed, you twist the wrong way, and you herniate a disc in your neck leading to surgery. Or you cough hard and you herniate a disc in your back. The statute's very clear in all the briefs we give you the definition of act of duty. It has to be an act of police duty inherently involving special risk not ordinarily assumed by a citizen in the ordinary walks of life imposed on a police officer. And the court's already stated you understand that definition and you understand getting out of a hospital bed or a gurney is not an act of duty. It doesn't meet that definition. Devaney talks about the 7-week delay. I'll let Mr. McQuarrie get into that argument specifically about Devaney as we've divided our time. But I think the court will understand that it's really not a delay issue. It's an issue that the court needs to focus on. What was the occurrence that took place that ultimately led to the hip pain, that ultimately led to the series of events, the surgeries that ultimately forced him to now be disabled? Counsel, what deference does the trial court owe to the board's findings? This case was fully briefed and orally argued in front of Clarence Harrison of our 3rd District Court. And the court, after hearing the argument and reading the briefs, ruled in favor of the board and supported the underlying decision on the board. Is there any special deference that the trial court owes to the findings of the board? Like standard review that the trial court has? Yeah, clearly examining whether or not the findings that were held by the board are against the manifest weight of the evidence. And we would intend that the record is replete with the plaintiff's own statements and statements by the doctors that clearly the board had sufficient information to hang their hat on to conclude that the event that ultimately led to this gentleman requiring surgical procedure was getting up off the gurney and not what happened some 90 minutes earlier. What is our standard review then? Your standard review is, again, against the manifest weight of the evidence. You're going back and reviewing what the original board determined to say. Is it against the manifest weight of the evidence? And you're saying that that was the same standard review for the trial court? Yes, sir, because we are examining how the board interpreted the facts and applied them in this particular case. And we think the facts are very clear. Opposing counsel is correct that this is not an adversarial... Do we owe any deference to the trial court's findings? I find it significant. Ultimately, I think this court's job is to go back and look at what the board did to determine whether or not the board's actions were against the manifest weight of the evidence. So we don't owe any deference to the trial court's findings? I do not believe you do. With that, I will allow opposing... Thank you, counsel. Good morning, Mr. Justices. My name is Timothy Guerman. I represent the city of Collinsville, who is the intervener in this matter. I'll try to avoid covering ground that's already been covered. There certainly is no dispute here that there was a pre-existing condition that Officer Jackson had and that under the law, a pre-existing condition does not automatically disqualify somebody from getting a line-of-duty disability pension. There's also no dispute that prior to July 19, 2007, Officer Jackson had advanced-stage avascular necrosis in both of his hips. We've seemed to have lost track of one of them, but it was well established that both of these hips were, for lack of a more delicate phrase, rotting, even as he reported to work on a daily basis. But all indications are that as of that particular date, he simply didn't know at the time. Now, all three of the doctors that have been referenced here, Strickland, George, and Wilkie, agreed on this very diagnosis, that those hips were rotting away as of July 17, when he reported for work. Now, in order for the plaintiff to succeed here, he's going to have to show that something happened on July 19, 2007 that aggravated or exacerbated his condition to the point that he had to have both of his hips replaced and which he wouldn't have otherwise have needed. And that's important, that those hip replacements wouldn't have otherwise been needed. Now, the other thing that he would have to do, and which has already been talked about at length, is that there has to be a nexus between that event and a duty-related activity that would allow him to fall under the duty-related pension. My co-counsel has covered that ground pretty thoroughly. As to the doctors and the medical evidence that's in the record, Drs. Strickland and George clearly stated, both in their written reports and in their evidence depositions against vigorous cross-examination, that nothing happened on July 19, 2007 which altered Mr. Jackson's condition or his course or required him to have hip replacements that he would not have otherwise needed. They were very clear in that diagnosis. They did acknowledge that the condition may have become symptomatic. In other words, Mr. Jackson may have first become aware of it on July 19, 2007. And Drs. Strickland and George also acknowledged that typically surgical intervention doesn't happen before the patient becomes aware of the condition. But both of them disagreed, and again, in the face of vigorous cross-examination and their evidence depositions, that the alleged events of July 19, 2007 as described by Mr. Jackson himself made any difference in his condition or in the outcome that required his hip replacements. Now, the third doctor that was mentioned, Dr. Wilkie, he stated that July 19, 2007 regarding the alleged injury and accident, and I think that's important. He was never cross-examined as to what that meant. But clearly, when he talks about alleged, he's relying only on Mr. Jackson's narrative to him. What's significant to Mr. Jackson's symptoms and the need for hip replacements? This goes back to the other doctors who said, yeah, you don't go replacing them before they know they have a problem. Doesn't mean that's when they first start having a problem, talking only about when it becomes symptomatic and when they become aware. So in short, the bulk of the medical evidence that's on the record is that there was nothing that occurred on July 19, 2007 that made a substantive difference in Mr. Jackson's fate or his medical status. Let me clarify something here. I thought I had this right in my head. There are three docs, right? In page 8 of the plaintiff's brief, he says he was subsequently examined by three physicians selected by the defendants, all of which concluded that Jackson's hip injury was related to the July 19 incident. We would disagree with that assessment. And this goes back to the Devaney case, which cautions courts against taking very selective reviews of medical reports. As we argue in our briefs, there is a full description of what those doctors said about that. Two of those doctors says it was not related to the July 19. Is that correct? That's correct. They said they were the ones saying, you know, this was looking to blow up at any particular second. This didn't make any difference. That's when he found out about it. So even if he was able to establish that there was something that made a medical difference in his condition on July 19, then the question becomes what happened. And as my co-counsel has described, if there truly was an injury, not just a twinge, not just a symptom that he discovered when he moved from gurney to gurney, but an injury that happened, was that a degree-related event? And that ground has already been covered, I think, pretty fully. A few words about the Devaney case that was brought up by Plank. As I indicated before, Devaney, among other cases, strongly counsels against a selective reading of medical reports. And we have argued that more fully in our brief, and we have illustrated how a fuller contextual exploration of those medical reports we think leads to a different conclusion than what's been described by Plank. There are also two marked differences in the Devaney cases which make them inapplicable here. First is, in the Devaney case, even though there was a delay in reporting the injury in the claimant, there was no history of giving inconsistent accounts of how that injury happened. Here, and as has already been discussed with Drs. Heffner and Dr. Kraus, Plank of his own treating physicians, he told them that he felt the pop when he came off the gurney. He didn't tell them he felt the pop when he was dragging a body or a person out of a burning house or dragging wheelchairs or oxygen tanks or all those things which were noble and brave and part of what happened in that fire response call. But they weren't what he said about when he actually felt that he had this new level of injury. What happens if he testified that he felt the pop when he was walking to the ambulance from the burning house? I think that's a much closer call. I think that may be much closer in the course of duty. In the prior case, there was an attorney who asked for a little indulgence about the personal anecdote. I was 35. I got out of a recliner wrong and my back went south every two years to a chiropractor. For no apparent reason, no pre-warning. It was simply positional. I wasn't doing anything particularly stressful. I was just getting up in the wrong position out of a recliner. The other thing that happened in the debating case is that apart from giving an uncontested, albeit late, account of his most recent injury, Mr. Kabanese or the claimant's reports were actually backed up by the medical evidence. As we've suggested here, we have a very differing view of what the medical reports have provided as a basis for the pension board's decision than what's been described by the plaintiff. This case comes down to a finding of fact that the first pain that was felt was when he got off a gurney. And that's based on a credibility determination which is the province of Newport. If that was all that was represented, I think I can agree with you. But I thought he said that he, at the scene, said he had experienced low back pain. Wouldn't that be consistent with hypnocrisis? I don't believe that's the case. Medical assessment is above my pay grade, but I don't necessarily equate the two. But did he say that? I think there's at least one form that does reflect some low back complaint. However, there's also a dearth of records that go beyond that, that make no mention of it until this point in time when he transfers from the x-rays, specifically at 9 p.m., at 2100 hours, which is, again, the narrative of it. For handwriting analysis fans, as they read these reports, it seems pretty clear that that's very supportive of exactly the account that he gave Dr. Sprouse and Dr. Hefner, his own treating physicians. In any event, unless there are further questions from the panel, I'll close by saying these are questions that are squarely within the province of the court. The record evidence is more than supportive. We think more than a profoundness of evidence actually supports that outcome, and in this case, it cannot be overturned by a unanimous weight of evidence. Thank you, counsel. Counsel? I appreciate the opportunity to respond because after a hearing, I don't know who was at the hearing and who wasn't. The emergency room records talk about, second page after the nursing documentation, complaint of hip pain. There was no mention of jumping off a gurney. Then, with respect to Dr. Hefner's records, the complete history is that he had an injury on July 19 of this year when he was pulling some people out of a house fire and pushing and pulling an oxygen machine and was taken to the hospital with smoke inhalation. After he got out of the hospital, he noticed pronounced pain in his right lower extremity. And then, in all fairness to counsel, with Dr. Krause, patient, 43-year-old male police officer, he was responding to a house fire on July 19, 2007, was helping a woman out of the house. Afterwards, he was taken to the hospital with smoke inhalation while he was there, he was getting out of the gurney to get an x-ray and felt a pop in his hip and severe pain. We talked about nexus. Obviously, there is a nexus between the house fire and the hospital. If you look at other cases, whether it's workman's compensation, civil cases, normally you're responsible not only for the original injury but any complications arising out of treatment for that injury. In response to the court, nexus is an issue. But also, I point out, there's absolutely nothing in the transcript about his hips rotting away. There is absolutely no testimony in the transcripts or depositions that his condition had deteriorated to the point that any activity of daily living would have caused this problem. And most importantly, or secondly importantly, there is no opinion in the record that getting off that gurney was the sole proximate cause of his problem with his hip or his aggravation. And that's what would have been required to deny the claim on this basis. And finally, and most importantly, I know you're experienced members of the bench, you're in private practice, and what's the elementary rule? What do doctors treat? Do doctors treat findings? No. They treat findings and symptoms. That's what it's all about. You treat findings and symptoms. It's not just merely findings. For these reasons, I would ask that the court decision be reversed as can be manifest for the hearing. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel.